

Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| POMWONDERFUL, LLC,<br><br>Plaintiff<br><br>v.<br><br>NAKED JUICE CO. OF GLENDORA, INC.; and DOES 1-10, inclusive<br><br>Defendant | CASE NO. CV 05-8993 NM (MANx)<br><br>OPINION DENYING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION<br><br>THIS CONSTITUTES NOTICE OF ENTRY AS REQUIRED BY FRCP, RULE 77(d). |

## I. INTRODUCTION

On January 13, 2006, Plaintiff Pomwonderful ("POM") filed a motion for a preliminary injunction, seeking to enjoin Defendant Naked Juice from using the "POW!" mark in its marketing and advertising.[1] On February 3, 2006, Defendant Naked Juice filed its opposition; on February 7, 2006, POM filed its reply. For the

---

[1] On January 6, 2006, the court denied Plaintiff's *ex parte* application for a temporary restraining order seeking the same relief sought in this motion.

reasons set forth below, POM's motion for a preliminary injunction is DENIED.

## II. FACTS

Plaintiff POM uses its mark "POM" in connection with the marketing and sale of, *inter alia*, its pomegranate juice. Mot. 1. POM began bottling, marketing and selling pomegranate juice in 2002. Tupper Decl. ¶ 3. Over the past two years, POM has spent over $20 million marketing and promoting its POM-branded products in a variety of media, including billboards, phone kiosks, bus shelters, in-store point-of-sale materials and product placements. Id. at ¶ 5. "A key element of [POM's] marketing campaigns has been its concentration on the health benefits associated with pomegranates and pomegranate juice. . . . [T]he centerpiece of Plaintiff's advertising campaign has been its emphasis on the high level of antioxidants contained in Plaintiff's products." Id. at ¶ 7.

POM is the owner of a number of federal trademark registrations, including, *inter alia*, POM WONDERFUL (with heart design) used in connection with fruit juices. Id. at ¶ 10. The "POM" mark is depicted in large, white letters set on a dark red background. The letter "O" is in the shape of a heart with a white outline and a red-colored center (a different red from the background). When displayed on POM pomegranate juice, the juice provides the dark red background. Id. at ¶ 11. See also e.g., Mot. 7 (presenting picture of a bottle of POM pomegranate juice).

Naked Juice has been selling its juices since 1983 when it "first sold [the juices] to beach goers [in Santa Monica, California] 'towel to towel'." Hicks Decl. ¶ 3. Today, Naked Juice is sold in places such as Kroger and Whole Foods Market. Id. Like POM, a key element of Naked Juice's marketing campaign has been its concentration on the health benefits of natural juices. Id. Naked Juice sells a wide selection of "straight and blended juices, smoothies, herbals, fortifieds, and superfood juices." Id. at ¶ 4. Defendant advertises outdoors, on the Internet, in print and through store inserts and hang tags. Id. at ¶ 7.

Both POM's and Naked Juice's products are normally not found alongside traditional juices, such as orange juice. Rather, both parties' juices are "stocked in separate refrigerators that focus on 'health' products or are stocked in refrigerated units in the fruits and vegetables section" of a market. Id. at ¶ 8. POM's pomegranate juice sells for approximately $5.69 per 24-ounce bottle. Fisher Decl. ¶ 9. A 16-ounce bottle sells for $3.99. See n. 7 infra. Defendant's juices retail for about $3 per 15.2-ounce bottle. Hicks Decl. ¶ 8. On November 2, 2005, Naked Juice began its "POW! Right in the Ticker" ad campaign. Id. at ¶ 9. The campaign includes the slogans "POW! Right in the Ticker" and "POW! More Antioxidant Bang for the Buck." Id.[2] The slogan "POW! More Antioxidant for the Buck" appears on a coupon in the shape of a pomegranate that hangs from the neck of Naked Juice's trademark rectangular bottle. Id. at ¶ 13; Fisher Decl., Ex. B, 7. The background of the hang tag is a picture of a pomegranate. Id. When displayed, the hang tag "is folded to form a single circle to represent the pomegranate fruit." Id. At the top of the tag, above the words "Instant Savings Inside!" which appear in yellow, is the Naked Juice trademark in blue. Id.; Fisher Decl., Ex. A, 7. "POW!" appears in white lettering below "Instant Savings Inside!" Id. Below "POW!" appears the phrase "More Antioxidant Bang for the Buck." This phrase is written in white lettering considerably smaller in size and thinner than the "POW!" lettering. Id.

Along with its *ex parte* application for a TRO, POM filed a complaint alleging various causes of action. Three of the causes of action allege violations of the Lanham Act, specifically 15 U.S.C. §§ 1114, 1125(a) and (c). POM also alleges that Naked Juice acted in violation of state statutes prohibiting trademark

---

[2] In addition to the coupons that hang from individual bottles, Naked Juice also employs a shelf tag displaying the slogan "POW! Right in the Ticker." POM asserts that its motion is not directed toward this form of advertisement. Reply 2.

3

1  dilution, Cal. Bus. & Prof. Code § 14330, in violation of state unfair business
2  practices laws, Cal. Bus. & Prof. Code §§ 17200, et seq., and in violation of
3  common law unfair competition. See generally Complaint.[3]

## III. ANALYSIS

### A. Standard

A preliminary injunction is appropriate when the movant demonstrates either: 1) a combination of probable success on the merits and the possibility of irreparable harm; or 2) the existence of serious questions going to the merits and that the balance of hardships tips sharply in favor of the movant. Cadence Design Sys., Inc. v. Avant! Corp., 125 F.3d 824 (9th Cir. 1997); Sardi's Rest. Corp. v. Sardie, 755 F.2d 719, 723 (9th Cir. 1985). These standards "are not separate tests but the outer reaches of a single continuum." Int'l Jensen Inc. v. Metrosound USA, Inc., 4 F.3d 819, 822 (9th Cir. 1993) (internal quotation marks omitted). The test is a "continuum in which the required showing of harm varies inversely with the required showing of meritoriousness." Rodeo Collection, Ltd. v. West Seventh, 812 F.2d 1215, 1217 (9th Cir. 1987) (quoting San Diego Comm. Against Registration and the Draft v. Governing Board of Grossmont Union High Sch. Dist., 790 F.2d 1471, 1473 n.3 (9th Cir. 1986)). To overcome a weak showing of meritoriousness, a plaintiff seeking a preliminary injunction must make a very strong showing that the balance of hardships tips in his/her favor. See Rodeo Collection, 812 F.2d at 1217.

"An injunction never issues as a matter of course: '[i]n each case, a court must balance the competing claims of injury and must consider the effect on each

---

[3] In its motion, POM discusses only trademark infringement, not dilution. The standard used for analyzing federal, state, and common law trademark and unfair competition claims (based on trademark infringement) is the same, viz., likelihood of confusion. See Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc., 109 F.3d 1394, 1403 (9th Cir. 1997).

4

1  party of the granting or withholding of the requested relief[.]'" Schwarzer,
2  Tashima, and Wagstaffe, California Practice Guide: Federal Civil Procedure
3  Before Trial, ¶ 13:39 (1998). In moving for a preliminary injunction, the burden
4  of persuasion remains with the party seeking the relief. See West Point-Pepperell,
5  Inc. v. Donovan, 689 F.2d 950, 956 (11th Cir. 1982). However, a "preliminary
6  injunction is not a preliminary adjudication of the merits." Fed. Civ. Proc.,
7  ¶ 13:50. "The findings of fact and conclusions of law made by a court granting a
8  preliminary injunction are not binding at trial on the merits." University of Texas
9  v. Camenish, 451 U.S. 390, 395 (1981); Sierra On-Line, Inc. v. Phoenix Software,
10 Inc., 739 F.2d 1415, 1423 (9th Cir. 1984) (for preliminary relief, a court need only
11 find a probability that necessary facts will be established, not that such facts
12 actually exist.).

### B. Probable Success on the Merits

A plaintiff will succeed on the merits of its trademark infringement claim if it establishes that the defendant's use of a mark gives rise to a "likelihood of confusion" in the consuming public. E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1290 (9th Cir. 1992). A trademark is a word, symbol or device that identifies the source of goods or services. See 15 U.S.C. § 1127. The Ninth Circuit has characterized the objectives of trademark law this way:

> [T]rademark law, by preventing others from copying a source-identifying mark, reduces the customer's costs of shopping and making purchasing decisions, for it quickly and easily assures a potential customer that this item – the item with this mark – is made by the same producer as other similarly marked items that he or she liked (or disliked) in the past. At the same time, the law helps assure a producer that it (and not an imitating competitor) will reap the financial, reputation-related rewards associated with a desirable product.

Brookfield Comms., Inc. v. West Coast Entm't Corp., 174 F.3d 1036, 1053 (9th Cir. 1999) (citing Qualitex Co. v. Jacobson Prods. Co., Inc., 514 U.S. 159, 163-

164 (1995)).

"The core element of trademark infringement is the likelihood of confusion, i.e., whether the similarity of the marks is likely to confuse customers about the source of the products." Official Airline Guides v. Goss, 6 F.3d 1385, 1391 (9th Cir. 1993) (citing E. & J. Gallo Winery, 967 F.2d at 1290); see also, Int'l Jensen Inc., 4 F.3d at 825 ("A likelihood of confusion exists when consumers are likely to assume that a product or service is associated with a source other than its actual source because of similarities between the two sources' marks or marketing techniques." (internal citations and quotations omitted)). Likelihood of confusion is analyzed under what have come to be known as the "Sleekcraft factors": 1) the strength of the allegedly infringing mark; 2) the proximity of the goods; 3) the similarity of the marks; 4) evidence of actual confusion; 5) the marketing channels used; 6) the type of goods and the degree of care likely to be exercised by the purchaser; 7) the alleged infringer's intent in selecting the mark; and 8) the likelihood of expansion of the product lines. AMF, Inc. v. Sleekcraft Boats, 599 F.2d 341, 348 (9th Cir. 1979). "[T]his eight-factor test for likelihood of confusion is pliant. Some factors are much more important than others, and the relative importance of each individual factor will be case-specific." Brookfield Comms., 174 F.3d at 1054.

POM argues that the allegedly infringing marketing campaign creates "initial interest confusion" in the eyes of potential customers. "Initial interest confusion is customer confusion that creates initial interest in a competitor's product. Although dispelled before an actual sale occurs, initial interest confusion impermissibly capitalizes on the goodwill associated with a mark and is therefore actionable trademark infringement." Playboy Enters. v. Netscape Comms., 354 F.3d 1020, 1025 (9th Cir. 2004). Under the "initial interest confusion" theory, the court must still evaluate POM's claims using the Sleekcraft framework. See id. at 1026.

6

### 1. The Strength of the Allegedly Infringing Mark

"The scope of judicial protection against infringement depends upon the mark's distinctiveness. Certain marks are deemed inherently distinctive, and afforded the greatest protection, because their intrinsic nature serves to identify a particular source of a product." Official Airline Guides, 6 F.3d at 1390. Courts have placed marks on a spectrum to determine the scope of protection. The spectrum ranges from fanciful or arbitrary marks, granted the greatest protection, to generic marks, granted no protection. Suggestive and descriptive marks fall in the middle of the spectrum. A fanciful or arbitrary mark is one "invented solely to function as a trademark." Id. A suggestive mark is one that requires a person to use his or her imagination to make the connection between the mark and the product. Rodeo Collection, 812 F.2d at 1218. A mark is descriptive if it describes the product rather than its source. Such a mark is given protection only if it acquires "secondary meaning," where consumers can identify the source of the product from the mark. Official Airline Guides, 6 F.3d at 1391.

It is unclear whether Plaintiff is claiming its mark is suggestive or descriptive. While arguing that the "POM" mark is "not merely descriptive," Plaintiff asserts that the term has acquired secondary meaning – an element unnecessary for trademark protection of a suggestive mark. See id. (secondary meaning unnecessary for protection of suggestive mark); Mot. 11-13; Reply 7. Naked Juice, in turn, does not address Plaintiff's suggestion that the mark is more than "merely descriptive," but disputes Plaintiff's assertion that the POM mark has acquired secondary meaning. Opp 11. For the reasons set forth below, this court need not resolve whether the mark is descriptive or suggestive, as even assuming the latter, Plaintiff has failed to show a likelihood of confusion.

### 2. The Proximity of the Goods

"Related goods are generally more likely than unrelated goods to confuse the public as to the producers of the goods." Brookfield Comms., 174 F.3d at

1056. The parties agree that they are direct competitors. Mot. 13; Opp. 11.

3. The Similarity of the Marks

POM has failed to demonstrate sufficient similarity of the marks to show that consumers would likely be confused about the source of the products. Similarity of the marks "has always been considered a critical question in the likelihood-of-confusion analysis." Goto.com v. The Walt Disney Co., 202 F.3d 1199, 1206 (9th Cir. 2000). "The greater the similarity between the two marks at issue, the greater the likelihood of confusion." Brookfield Comms., 174 F.3d at 1052. "[S]imilarity is adjudged in terms of appearance, sound, and meaning." Goto.com, 202 F.3d at 1206. "The marks must be considered in their entirety and as they appear in the marketplace, with similarities weighed more heavily than differences." Brookfield Comms., 174 F.3d at 1055 (internal citations and quotations marks omitted). The parties' marks are usually encountered by consumers in a supermarket display. See, e.g., Ortiz Decl. Ex. A, 4. Naked Juice's hang tags appear only with Naked Juice's products. Fisher Decl. ¶¶ 2-3. Therefore, Naked Juice's hang tag cannot be analyzed alone against the POM mark. See, e.g., Mot. 2; Brookfield Comms., 174 F.3d at 1055. Rather, Naked Juice's mark must be analyzed as a consumer views it: hanging on a bottle. Brookfield Comms., 174 F.3d at 1055.

Viewed as part of a supermarket display, it becomes clear the two parties' marks are not similar in appearance. First, Plaintiff's "POM" mark uses a "distinctive" heart, outlined in white with a red center to represent the letter "O." Naked Juice makes no such use. Second, the lettering of "POM" and "POW!," while both in white, are very different. POM is written in neat, block lettering. By contrast, the "POW!" lettering is not block and has overlapping letters. Third, Naked Juice's mark contains an exclamation point, which POM's does not. While POM argues that the exclamation point adds to consumer's confusion, the court finds the opposite true. Indeed, the addition of an exclamation point on a word

that is already an onomatopoeic exclamation often accompanied by such punctuation, reinforces the differences in the two words. Fourth, Naked Juice's hang tags include Naked Juice's logo in blue above "POW!" POM has no such logo or anything resembling it.

Visually, the shapes of the bottles on which the marks appear are also drastically different. POM's bottle is in the shape of two spheres, flattened slightly and fused together. Naked Juice's bottle shape, however, is a three-dimensional rectangle. See Ortiz Decl., Ex. A, 4. Possible similarities between "POM" and "POW!" go unnoticed when viewed against the parties' drastically different bottles. Additionally, POM's mark appears against a backdrop of the deep red pomegranate juice. Defendant's mark appears against a lighter, muted red. See Ortiz Decl., Exs. A-B; Fisher Decl., Exs. A-B. The appearance of the marks in context is not similar.

The sounds and meaning of the two marks are very different. POM is pronounced like the first syllable of the word "pomegranate." POW! is pronounced to rhyme with "cow." POM has no meaning in the English language, because it is not a word.[4] POW is an exclamation, signifying the sound of a blow or explosion. See Merriam-Webster's Collegiate Dictionary 911 (10th ed., 2001).

4. Evidence of Actual Confusion

POM has presented neither evidence of actual consumer confusion nor survey data that demonstrates a likelihood of confusion. POM argues that evidence of actual confusion is not necessary for a finding of likelihood of confusion, and the absence of such is evidence is "generally unnoteworthy" given how difficult it is to prove. Reply 9-10 (citing e.g., Cohn v Petsmart, Inc., 281 F.3d 837, 842-43 (9th 2002) and Lois Sportswear, U.S.A., Inc. v. Levi Strauss &

---

[4] Pom is a word in Austral and NewZeal, meaning English immigrant. See Merriam-Webster's Collegiate Dictionary 902 (10th ed., 2001).

Co. 799 F.2d 867, 875 (2d Cir. 1986)).[5] While evidence of actual confusion may be difficult to obtain for a variety of reasons, POM has failed to provide survey data showing even a likelihood of confusion in the minds of potential customers. Judge Paez's observation on the significance of such data is instructive:

> [Plaintiff's] fail[ure] to provide a survey showing a likelihood of confusion .... warrants a presumption that the results would have been unfavorable. See, e.g., Cairns v. Franklin Mint Co., 24 F. Supp. 2d 1013, 1041-42 (C.D. Cal. 1998) (Paez, J.) ("Survey evidence is not required to establish likelihood of confusion, but it is often the most persuasive evidence. Consequently, a plaintiff's failure to conduct a consumer survey, assuming it has the financial resources to do so, may lead to an inference that the results of such a survey would be unfavorable. Here, plaintiffs had ample opportunity to conduct their own survey, and their failure to do so undermines their position that the advertisements at issue are likely to confuse consumers[.]")

Playboy Enters. v. Netscape Comms., 55 F. Supp. 2d 1070, 1084 (C.D. Cal. 1999) (Paez, J.). Naked Juice commenced this advertising campaign more than three months ago in November 2005. POM contends that it only found out about the campaign on December 22, 2005. Tupper Supp. Decl. ¶ 2. Assuming the truth of the assertion, nothing prevented POM from conducting a survey prior to filing the instant motion.[6] POM's failure to present any survey data showing a likelihood of confusion justifies inferring that no such likelihood exists. Playboy Enters., 55 F.

---

[5] Neither case helps Plaintiff. In Cohn, the Ninth Circuit upheld a grant of summary judgment for the *defendant* on the plaintiff's claim of trademark infringement, notwithstanding that the marks were – unlike the instant case – identical. 281 F.3d at 842-43. In Lois Sportswear, the Second Circuit's ruling upholding a grant of summary judgment in favor of the plaintiff noted not only the strength of the mark (Levi Strauss' back pocket stitching pattern), but the "essentially identical" nature of the allegedly infringing mark and a consumer survey "strikingly probative of the similarity of the two stitching patterns" and "somewhat probative of actual confusion." 799 F.2d at 869, 875.

[6] POM does not suggest it lacked the resources to do so.

10

Supp. 2d at 1084.

### 5. The Marketing Channels Used

POM argues that both parties utilize the same marketing channels. Mot. 15. "Convergent marketing channels increase the likelihood of confusion." Nutri/System, Inc. v. Con-Stan Indus., Inc., 809 F.2d 601, 606 (9th Cir. 1987). Naked Juice admits that it uses the same or similar marketing channels. Opp. 3.

### 6. The Type of Goods and the Degree of Care Exercised by the Purchaser

POM argues that because the price of juice is relatively low, and consumers are not discriminating when selecting a brand of pomegranate juice, the risk of confusion is great. Mot. 16. POM relies upon CSC Brands LP v. Herdez Corp., for the proposition that consumers of low-cost fruit juices are unlikely to exercise great care. 191 F. Supp. 2d 1145 (E.D. Cal. 2001) (Damrell, J.). In CSC Brands, the product was V-8 juice. POM neglects to note, however, that its product is nearly four times as expensive as V-8, making the comparison inapposite.[7] POM's product is not, in fact, a "low-cost fruit juice," but a rather pricey one, and consumers contemplating paying such prices are likely to be more discriminating than when selecting from among comparatively low-cost juices.

Finally, POM argues that it has spent millions of dollars researching and advertising the health benefits of pomegranate juice. This only reinforces the likelihood that consumers willing to pay $4 per 16-ounce bottle for a fruit juice to avail themselves of its alleged health benefits, are otherwise discriminating

---

[7] While POM argues that both its product and V-8 sell for $2-$4 per bottle, POM's $4 bottle contains 16 oz. of juice, while a comparably priced bottle of V-8 contains 64 oz. See www.albertsons.com (follow "shop" hyperlink; then follow "browse our online store" hyperlink; then follow "Los Angeles / Orange County/ Ventura" hyperlink; then follow "Search" hyperlink; then type in V8 and Pom for product names; then follow "vegetable juice" or "refrigerated juice & drinks" hyperlink) (showing V-8's 64-ounce bottle sells for $3.99 and POM's 16-ounce bottle sells for $3.99).

11

shoppers.[8]

### 7. The Alleged Infringer's Intent in Selecting the Mark

POM argues that the court can infer intent to confuse and deceive the public on the part of Naked Juice, because Naked Juice deliberately copied POM's trademark. Mot. 17. As discussed above, the court finds that the two marks are not similar in appearance, meaning or sound. See Section III (B)(4).[9]

### 8. The Likelihood of Expansion of the Product Lines

This factor is unimportant because Plaintiff and Defendant are direct competitors. See Brookfield Comms., 174 F.3d at 1055 ("The likelihood of expansion in product lines factor is relatively unimportant where two companies already compete to a significant extent.")

### 9. Conclusion

Based principally on the lack of similarity between POM's mark and Naked Juice's mark, and POM's failure to present any evidence showing a likelihood of confusion, the court finds that POM has failed to meet its burden of showing a likelihood of success on the merits.

### C. Irreparable Harm and Balance of Hardships

Because POM has failed to establish a likelihood of success on the merits, it faces a heavy evidentiary burden to demonstrate irreparable harm. See Rodeo

---

[8] POM does not – nor could it – suggest that because it has spent millions to research and promote the health benefits of pomegranate juice, other competitors may not market the product or advertise its health benefits.

[9] POM also argues that wrongful intent may be inferred because this is the second time Naked Juice has attempted to unfairly capitalize on the goodwill of POM. Reply 11-12. Because the court finds that Naked Juice has not copied POM's mark, it need not address POM's argument regarding Naked Juice's prior conduct in a separate case. In any event, the related case centers around claims that Naked Juice falsely advertised the health benefits of its "Acai Berry" juice, not on claims of trademark infringement. See generally Complaint, CV 05-2503 NM.

1  Collection, 812 F.2d at 1217 (to overcome a weak showing of meritoriousness, a
2  plaintiff seeking a preliminary injunction must make a very strong showing that
3  the balance of hardships tips in his/her favor).  POM claims that it will suffer harm
4  to its goodwill and reputation. Mot. 19.  Assuming POM's claim of damage to its
5  goodwill and reputation is true, POM's analysis does not take into account the
6  harm to Naked Juice if the court were to erroneously grant the preliminary
7  injunction.  POM has not shown that the balance of hardships tips sharply in its
8  favor.

## IV. CONCLUSION

For the foregoing reasons, POM's motion for a preliminary injunction is DENIED.

IT IS SO ORDERED.

DATED: February 16, 2006

Nora M. Manella
United States District Judge